# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### Appeal Nos. 14-2312 and 14-2313

**Appeal No. 14-2312**

### UNITED STATES OF AMERICA,
### Appellee

**v.**

### JOHN J. O'BRIEN,
### Defendant-Appellant

———

**Appeal No. 14-2313**

### UNITED STATES OF AMERICA,
### Appellee

**v.**

### ELIZABETH V. TAVARES,
### Defendant-Appellant

### GOVERNMENT'S OPPOSITION TO DEFENDANTS'
### <u>MOTIONS FOR RELEASE PENDING APPEAL</u>

The defendants, John J. O'Brien and Elizabeth Tavares, seek appellate review of the district court's (Young, J.) November 25, 2014, *Order* denying their motions for release pending appeal. [D.701]; FRAP 9(b). The district court correctly found that O'Brien and Tavares have not satisfied the statutory conditions for release because they have not shown that their appeals raise substantial questions of law which, if decided in their favor, are likely to result in reversal or a

new trial, *see* §3143(b)(1)(B). For those and the reasons that follow, the defendants' motion for release should be denied.

## I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

On July 24, 2014, defendants John O'Brien, Elizabeth Tavares and William Burke were convicted of racketeering conspiracy after a 12-week long jury trial. O'Brien and Tavares were also convicted of racketeering and four counts of mail fraud. [D.579]. On November 13, 2014, the district court sentenced O'Brien to a term of imprisonment of 18 months followed by one year of supervised release and sentenced Tavares to a term of imprisonment of 90 days followed by one year of supervised release. [D.694].

The object crimes of the racketeering conspiracy were multiple violations of the mail fraud statute and Massachusetts bribery and illegal gratuity statutes. The jury found that 19 acts of racketeering were proven, including ten acts of mail fraud and nine acts of providing illegal gratuities.[1] The jury found the defendants not guilty on ten counts of mail fraud and not proven on 20 predicate acts. [D.579].

---

[1] The jury convicted O'Brien and Tavares of mail fraud as charged in Counts 3-6 of the Indictment (related to the hires of Patrick Lawton, Kelly Manchester, Melissa Melia and Patricia Mosca). In addition, the jury convicted O'Brien and Tavares of racketeering (Count 2 of the Indictment), based, in part, on mail fraud relating to the hires of Lawton, Manchester, Melia, Mosca, John Chisholm, Brian Mirasolo, Douglas Maclean, Frank Glenowicz, Joseph Dooley and Bernard Dow.

The indictment alleged a wide-ranging conspiracy commencing in or before 2000 and continuing through April 2010. [D.1]

During the pendency of the conspiracy, O'Brien was the Commissioner of the Massachusetts Probation Department (MPD), and Tavares and Burke were Deputy Commissioners. The gravamen of the racketeering conspiracy was that the defendants engaged in a scheme to defraud for the purpose of concealing their operation of a systemic patronage hiring system in contravention of the Massachusetts Trial Court's policies and procedures which required a merit-based system. In order to effectuate the scheme to conceal the fact that employment and promotional decisions in the MPD were based upon patronage rather than merit, the defendants and their coconspirators devised a system that required the falsification of certain documentation connected to the hiring process so that the process appeared to comply with the requirements of the Trial Court's Personnel Policies and Procedures Manual ("Manual" or "Trial Court Manual").

This practice manifested itself within the MPD with the development of a somewhat complex, yet totally fraudulent, hiring and promotion protocol. Generally, jobs were posted on a government web site and applications were solicited. The MPD personnel department screened the applications for unqualified candidates. The subsequent interview process involved three stages -- a preliminary, second round, and final interview. High-ranking members of the

MPD who participated in these interviews were given the names of "sponsored" candidates by the defendants and other members of the conspiracy to ensure that those individuals successfully moved through the interview process. Each applicant was scored and/or ranked with the intention of moving the sponsored candidate(s) to the next round. Scores and/or rankings were falsified as necessary to move the sponsored candidates through the process and to provide the appearance that their movement through the process was based upon merit. The process allowed only eight candidates per position to progress to the final round.

The second round interview was generally conducted by the First Justice of the local court where the job existed, the Chief Probation Officer of that court, and a Regional Administrator from the Commissioner's Office. In the vast majority of cases, the "sponsored" candidate(s) failed to emerge from this second round interview with high marks. Often, the fact that judges, who were not participants in the conspiracy and who were involved in theses interviews, ranked and/or scored these candidates accurately served to undermine the goals of the conspiracy. In order to insulate an employment or promotion decision from subsequent scrutiny, the defendants created a "final" round interview which was designed to ensure that sponsored candidates received the top scores.

The final round interviews were conducted almost exclusively by two Deputy Commissioners, Frances Wall and Patricia Walsh. Occasionally, Deputy

4

Commissioner Edward McDermott filled in when either Wall or Walsh was not available. Wall, Walsh and McDermott received the names of the sponsored candidates from O'Brien or Tavares. Wall, Walsh and McDermott scored the final-round applicants and always gave the sponsored candidate the highest score regardless of the performance of that individual in the interview. Often, the interviewers embellished the sponsored candidate's answers to questions to justify the scores. In other cases, they actually changed the answers.

Chapter 211B of the Massachusetts General Laws, Section 8 required, *inter alia*, the promulgation of standards for the appointment and promotion of Trial Court employees. The Trial Court Manual was issued pursuant to this statutory directive. This statute, which was in effect during the entire time period of the conspiracy, also required the appointing authority (in this case, the Commissioner of Probation) to certify to the Chief Justice of Administration and Management of the Trial Court ("CJAM") that all employment decisions were consistent with the provisions of the Manual. As set forth above, the Manual required a merit based hiring system. See §4.304 (requiring that "all appointments be made solely on the basis of merit.") Thus, in order to obtain approval for his appointments, O'Brien falsely certified to the CJAM that he had complied with the Manual's requirements. The false paper trail created by O'Brien and his coconspirators made

it appear that the proposed employment of a sponsored candidate was based on merit rather than patronage.

The defendants engaged in this scheme to obtain favorable treatment from the state legislature and other powerful government officials regarding budgetary requests and other legislation that affected the MPD.  This conspiracy was fueled by the passage of legislation in approximately 2001 that centralized the hiring authority for the MPD in the Office of the Commissioner.  Prior to 2001, the hiring for probation officers was controlled by the First Justice of the court in which the applicant had sought employment.  This legislative change was championed by then Speaker of the House, Thomas Finneran, and sponsored by Representative Salvatore DiMasi.  In lobbying for the passage of this legislation, Finneran instructed O'Brien to communicate to other members of the state legislature that O'Brien favored patronage.  After the passage of this legislation, O'Brien advised his managers that his policy was to serve the needs of the legislature by hiring "sponsored" candidates, and the legislature would reciprocate by acting favorably on MPD budgetary and legislative requests.

Predictably, members of the Massachusetts legislature routinely sought employment for friends, relatives, and political supporters with the MPD.  This activity was so extensive that almost every hire and promotion was predicated on the nature of the political sponsorship.  Powerful members of the legislature carried

the most influence with O'Brien.  In addition to members of the legislature, other powerful members of state government sponsored candidates for employment with the MPD.

When positions were available, the hiring activity was frenetic.  Hundreds of applicants might apply for a single position.  Interviewing applicants became a full time job for members of the interview panels.  Over the period 2004 through 2008, hundreds of positions were posted on the Trial Court's web site.   Tracking sponsored candidates through this process required the creation of spreadsheets containing the name of the applicant, the sponsor, and the desired position.  Managing this process was a full time job for an O'Brien crony, Ed Ryan, who acted as a legislative liaison.  Ryan's real job was to service the hiring requests of members of the legislature and keep the sponsors informed regarding the progress of their respective candidates.

Probation, like other parts of state government, suffered through periods when there were hiring freezes.  One of these periods was from 2001 through 2004.   Another period was subsequent to 2008 during the fiscal crisis.  Accordingly, most of the hiring that has been the subject of this prosecution occurred between 2004 and 2008.  However, O'Brien was able to continue to hire and promote individuals through periods when hiring was frozen by appointing them in an "acting" or "temporary" capacity.  Additionally, hiring for the electronic

monitoring program ("ELMO"), which was instituted in 2000 appeared to be unaffected by the 2001 freeze. O'Brien utilized the ELMO program to provide jobs for numerous politically sponsored candidates.

In 2006, the legislature enacted a statute that required GPS electronic monitoring of certain sex offenders and individuals involved in domestic abuse. MPD was designated as the agency required to effectuate this legislative mandate. During 2007 and 2008, approximately 40 individuals were hired as temporary employees by MPD to conduct this electronic monitoring. By designating these positions as temporary, O'Brien was able to avoid many of the hiring protocols required by the Manual. O'Brien gave approximately ten of these positions to then Chairman of the House Ways and Means Committee Robert DeLeo to dole out to his supporters in the legislature. At the time, DeLeo was planning to run for Speaker of the House. O'Brien appointed approximately ten individuals whose names he received from a DeLeo staffer. These individuals were hired without any interviews.

## II.     STATUTORY REQUIREMENTS AND STANDARD OF REVIEW

"Under the Bail Reform Act of 1984, there is no presumption in favor of release pending appeal; on the contrary, even when the conviction does not involve a crime of violence, detention (following conviction and sentencing) is mandatory," unless the Court determines that *both* of the statutory requirements for

release are satisfied. *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002). Specifically, detention is mandatory unless the court finds: (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal [or] an order for a new trial[.]" 18 U.S.C. §3143(b)(1).[2]

With respect to the latter requirement, this Court has stated that there are two distinct requirements: "(1) a substantial question of law or fact and (2) that if determined favorably to defendant on appeal, "is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985).

In determining whether an appeal raises a substantial question of law or fact, it is not enough for a defendant to show that a disputed point of law or fact was "fairly debatable" or that a "possibility of reversal" exists. *Id*. at 523 (vacating district court's order and revoking bail upon finding that the district court erroneously ordered bail when it concluded that there was a "possibility of

---

[2] The statute also provides for release when, in addition to the other requirements, appeal is likely to result in "a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. §§ 3143(b)(1)(B)(i)-(iv). Neither Tavares nor O'Brien have raised sentencing claims at this juncture.

reversal" on appeal).  Rather, this Court has stated that the appeal must present a "close question or one that very well could be decided the other way."  *Id*. at 523 (citing *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

This Court "independently reviews" a district court's ruling on a request for release pending appeal, "giving deference to the determination of the district court."  *United States v. O'Brien*, 895 F.2d  810, 814 (1st Cir. 1990); *Bayko*, 774 F.2d at 520.   Independent review is an intermediate level of scrutiny, more rigorous than the abuse-of-discretion or clear-error standards, but stopping short of plenary or de novo review. *United States v. Tortora*, 922 F.2d 880, 883 (1st Cir. 1990).

## III.  <u>ARGUMENT</u>

### A.  **THE ISSUES RAISED IN TAVARES'S BRIEF DO NOT PRESENT A SUBSTANTIAL QUESTION OF LAW LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL.**

Tavares contends that the district court erred in permitting jurors to question witnesses and that this constituted a violation of her right to a fair trial. (Brief at 8-20). Tavares also contends that there were multiple defects in the district court's jury instructions and that these defects regarded matters crucial to her defense of the case. None of these issues raise a substantial question of law which, if decided in her favor on appeal, is likely result in a reversal or new trial. *See* 18 U.S.C. §3143(b)(1)(B).

### 1.    The Jury's Questions Do Not Present a Substantial Issue

At the outset of the trial, the district court informed the jury that it would have the opportunity to ask questions of the witnesses. The court informed the jurors that if they had a question for a particular witness, they could write the question on a piece of paper from their notepad and pass the question to the jury foreperson. The jury foreperson would then raise her hand to signal the courtroom deputy clerk that there was a written question for the witness from the jury. The deputy clerk would retrieve the written question and provide it to the judge. The judge would review the question and, if the judge was inclined to ask the question, the judge would hand it back to the deputy clerk so that she could share it with the government and the defendants.[3] If any party objected to the question, they would note their objection on the slip of paper. After the parties had the opportunity to review the question and note their objections, if any, the paper would be handed back to the deputy clerk. The deputy clerk would then return the slip of paper to the judge.[4] If there were no objections, the judge would then direct the juror's question to the witness at an appropriate point in that witnesses examination. If

---

[3] If the judge was not inclined to ask the question, the slip of paper would be returned to the deputy clerk and it would be marked "not asked." However, the question was available for the parties to review at the next recess.

[4] The witness would continue to be examined while this process was unfolding.

there were objections noted, and the judge wished to hear from the parties, a sidebar conference would be ordered.

Tavares argues that the questioning of witnesses by the jurors denied her the right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment. (Motion at 8). This argument is faulty because there is no evidence that the jurors were ever impartial.

Significantly, this Court, and every court of appeals to address the issue of jurors submitting questions to be asked of witnesses during trial has determined that it is a matter within the sound discretion of the trial court, and that juror questions are not *per se* prejudicial. In one of the more recent decisions to address this issue, *United States v. Rawlings*, 522 F.3d 403, 407 (D.C. Cir. 2008), the court found that "at least ten circuits had considered the issue and concluded that juror questions are within the trial judge's discretion." *Id.*, citing *United States v. Sutton*, 970 F.2d 1001, 1005 (1st Cir. 1992); *United States v. Bush*, 47 F.3d 511, 515 (2d Cir. 1995); *United States v. Hernandez*, 176 F. 3d 719, 723 (3d Cir. 1999); *DeBenedetto v. Goodyear Tire and Rubber Co.*, 754 F.2d 512, 516 (4th Cir. 1985); *United States v. Callahan*, 588 F.2d 1078,1086 (5th Cir. 1979); *United States v. Collins*, 226 F.3d 457, 461 (6th Cir. 2000); *United States v. Feinberg*, 89 F.3d 333, 337 (7th Cir. 1996); *United States v. Groene*, 998 F.2d 604, 606 (8th Cir. 1993);

*United States v. Gonzalez*, 424 F.2d 1055, 1056 (9th Cir. 1970); *United States v. Richardson*, 233 F.3d 1285, 1288-89 (11th Cir. 2000).

Furthermore, the *Rawlings* court, as well as many other courts, citing this Court's opinion in *Sutton*, found that "the practice offers substantial benefits. For example, it can help focus the jurors, clear up confusion, alert counsel to evidentiary lacunae and generally ensure that the jurors have the information needed to reach a reasoned verdict." *Rawlings*, 522 F.3d at 407-408, citing *Collins*, 226 F.3d at 426; *Bush*, 47 F.3d at 514, 516; *Sutton*, 970 F.2d at 1005 n. 3; *Callahan*, 588 F.2d at 1086. In the present case, nothing in the record suggests that the jury's opportunity to question the government's proof undermined its ability to reach a fair and well-reasoned verdict.

In a more recent case, also out of the Seventh Circuit, *United States v. Sykes*, 614 F.3d 303 (7th Cir. 2010), the court reiterated the position it originally enunciated in *United States v. Feinberg*, 89 F.3d 333 (7th Cir. 1996) (and that it further explained in *SEC v. Koenig*, 557 F.3d 736 (7th Cir. 2009)). In *Sykes*, the court stated, "We held [in *Feinberg*, 89 F. 3d at 337,] that the district court may, in its discretion, allow jurors to propose questions to be put to the witnesses." *Sykes*, 614 F.3d at 312. The *Sykes* court highlighted its decision in *Koenig* and stated, "We recently revisited the issue of juror questioning in *SEC v. Koenig*, and took a far more approving view of the practice, explaining that the American Bar

Association recommended it and recent research on juror questioning had established its benefits. In particular, we noted our own circuit's participation in the ABA's American Jury Project and observed that the 'judges, the lawyers for the winning side, and tellingly, the lawyers for the losing side, all concluded (by substantial margins) that when jurors were allowed to ask questions, their attention improved, with benefits for the overall quality of adjudication.' Nevertheless, we noted the Jury Project's 'proviso that jurors should submit their questions to the judge, who will edit them and pose appropriate, non-argumentative queries.'" *Sykes*, 614 F.3d at 313. In addition, the *Sykes* court further held that "the practice could be beneficial in some contexts, 'such as conspiracy or antitrust cases, in which the facts are so complicated that jurors should be allowed to ask questions in order to perform their duties as fact-finders.'" *Id.* (citing *Feinberg*, 89 F.3d at 337). The district court's decision to allow jury questioning was reasonable in this case given the large volume of information that was submitted to them in a rather compressed timeframe.

As stated above, this Court upheld the practice of jurors posing questions to witnesses in *United States v. Sutton*, 970 F.2d 1001, (1st Cir. 1992), and *United States v. Cassiere,* 4 F.3d 1006 (1st Cir. 1993). In *Sutton*, which was a rather complex mail and wire fraud prosecution, the Court upheld the practice of jurors asking questions of the defendant and other witnesses. This Court held "especially

in complex cases," "in which a greater-than-average risk of jury confusion existed, the positive value of allowing juror-inspired questioning was relatively high," and therefore, "allowing juror-inspired questions in a criminal case is not prejudicial *per se*, but is a matter committed to the sound discretion of the trial court." *Sutton.* 970 F.2d at 1005. The Court further stated that it would review the propriety of the practice on a case-by-case basis based on the totality of the circumstances. *Id.*

Following *Sutton*, this Court once again upheld the practice in *Cassiere*. Like *Sutton*, *Cassiere* was another somewhat complex mail and wire fraud case. Tavares, like the defendant in *Cassiere*, "objected to allowing juror questions and to the number of asked," but did "not argu[e] that any specific question was improper." *Cassiere*, 4 F.3d at 1017. This Court stated: "Other courts of appeals have upheld convictions where the court asked varying numbers of questions that the jurors proposed. In *United States v. Lewin*, 900 F.2d 145 (8th Cir. 1990), the court, over objections made in the jury's presence, asked six questions. The Fourth Circuit upheld a conviction in which the trial court asked ninety-five juror questions during a three-week trial. *Debenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512 (4th Cir. 1985)."

As this Court in *Cassiere* found:

> In each of these cases the court focused on the effect of the questions on the trial, ***not the number of questions***, in and of itself. Thus, the *Lewin* court approved the asking of juror questions because they were factual in

> nature and merely 'sought clarification of previous testimony and did not introduce new or unrelated subject matter.' 900 F.2d at 148 (emphasis added). In *DeBenedetto*, despite the large number of questions (95), the court 'examined carefully each of the questions propounded by the jurors and [ ] perceive[d] no bias in any of the questions.' 754 F.2d at 517."

*Id.*

In *United States v. George*, 986 F.2d 1176, 1179 (8th Cir. 1993), a case in which there were 65 questions submitted to the district court by the jurors, the court noted that there was no error because the district court employed prophylactic measures, measures which were similar to those recommended in *Sutton* and *Cassiere*. Furthermore, the *George* court distinguished the situation where "jurors were allowed to direct questions orally to the bench after each witness testified, and, if the court deemed the question proper, the witness was then instructed to answer it…[noting] some of the dangers inherent in allowing jurors to raise questions within the hearing of other jurors." 986 F.2d at 1179 (internal citations omitted). Still, the court "maintained its standard that prejudice must be determined according to the facts of each case." *Id.* The concern expressed in *George* is not present in this case.

Moreover, this case does not involve juror-inspired questions posed to the defendants. In both *Sutton* and *Cassiere*, unlike the present case, the defendants took the stand and testified on their own behalf. In both instances, the district court

allowed the jurors to ask questions of the defendants.  In *Sutton*, this court noted that "juror-inspired questioning becomes particularly troublesome when questions are directed at the [criminal] defendant." 970 F.2d at 1006 n. 6.  Even so, in both cases, this Court found no error in the district court asking juror questions of the defendants who took the stand.  Of course, this Court reiterated that certain prophylactic measures should be utilized by the district court such as, "The district court should inform counsel at the earliest possible time of its intention to use this technique and allow counsel the opportunity to object.  The court should instruct the jurors that they should limit their questions to important points, that at times the rules of evidence will dictate that the court not ask a question, and that the jurors should draw no implication from the court's failure to pose a juror-proposed question to the jury. The jurors should reduce their questions to writing and pass them to the court. Before asking a question, the court should offer a sidebar conference to give counsel the opportunity to object.  Finally, in its charge, the court should include a prophylactic instruction, along the lines suggested in *Sutton*." *Cassiere,* 4 F.3d at 1018.

It is important to note that the trial judge in both *Sutton* and *Cassiere* was the same as the instant case, Judge Young.  Therefore, history, and the record of the case, demonstrates that the district court was well aware of the risks inherent in the juror questioning and went to great lengths to guard against these potential risks.

The district court employed the recommended prophylactic measures, required written submissions, provided counsel the opportunity to object privately to the overall procedure and to each question, and the judge exercised discretion in selectively determining which questions would be asked and which would not. In addition, on several occasions during the course of the approximately 40-day trial, the district court reminded the jury as to the danger of reaching conclusions and forming opinions before all of the evidence was received and the parties rested. Furthermore, there can be no doubt that this trial was a factually complex case that involved allegations of racketeering, racketeering conspiracy, mail fraud, and state bribery and gratuity violations. The trial spanned the course of 12 weeks, and the government's case-in-chief consisted of 60 witnesses and thousands of pages of documentary exhibits. Based on the factual complexities of this case, the voluminous evidence presented, and the diligent precautions utilized by the district court, there was no error in allowing the jurors to submit questions to the witnesses in this case.

Of course, it is critical to note that the 11 circuits that have reviewed the practice of jurors asking questions of witnesses during a trial recognize that there are potential risks with the practice and that district judges who permit questioning should implement precautionary procedures. For instance, the *Sykes* court reiterated the instructions it proposed years earlier in *Feinberg* and instructed

district courts to "take prophylactic measures in an attempt to prevent the practice from harming either party. For example, common sense dictates that the questions should be proffered in writing to the district court judge. By reducing the questions to writing, a court eliminates the possibility that a witness will answer a question prematurely. Written questions also guard against juror commentary that suggests or precipitates premature deliberations." 614 F.3d at 337 (internal citations omitted). Critically, the district court in the present case scrupulously followed the prophylactic measures suggested by this Court in *Sutton*, *Cassiere*, and the other circuits that have examined this issue and, therefore, the district court's discretion to employ juror questioning was not abused.

It is undisputed that the district court took great care in administering the juror questioning procedure. Nevertheless, like the defendant in *Richardson*, Tavares claims that the jury questioning may have led to premature deliberation and turned the jurors from neutral fact-finders into advocates. However, similar to the defendant in *Richardson*, Tavares "cites no record evidence indicating the jurors actually talked to each other about the questions they planned to ask, and the questions posed do not reflect any opinion the jurors may have held regarding either the credibility of any single witness, or the guilt or innocence of Richardson." *Richardson*, 233 F.3d at 1291. As in *Richardson*, Tavares "has failed to present any evidence of prejudice resulting from the juror questioning, and has

failed to demonstrate that the district court abused its discretion in allowing the practice." *Id.*

Tavares reproduces theoretical arguments against juror questioning that have been previously advanced by other authorities. She cites and relies heavily upon *United States v. Ajmal*, 67 F.3d 12 (2d Cir. 1995), and *United States v. Bush*, 47 F.3d 511 (2d Cir. 1995), for the proposition that jurors have difficulty remaining neutral fact-finders when they are acting as inquisitors or advocates. Both *Bush* and *Ajmal* are easily distinguished from the present case.

In *Bush*, the defendant was convicted of armed bank robbery after a brief and straight-forward jury trial. While noting that allowing jury questioning is a matter within a trial judge's sound discretion, the court discouraged its use. 47 F.3d at 515. What is unique about *Bush*, however, is that the jurors did not reduce their questions to writing. Instead, the jurors formulated numerous questions verbally, and directed them to the defendant while the defendant was on the stand (obviously within earshot of all the other jurors). *Bush*, 47 F.3d at 513-14. Even so, the court in *Bush* found no plain error "[b]ecause, in the instant case, the limited and controlled juror questioning allowed by the district court did not prejudice Bush." 47 F.3d at 516.

Similarly in *Ajmal*, the district court allowed juror question even though the trial was a rather simple and "banal drug conspiracy." Furthermore, the district

court in *Ajmal* "encouraged juror questioning throughout the trial by asking the jurors at the end of each witness's testimony if they had any queries to pose. Not surprisingly, the jurors took extensive advantage of this opportunity to question witnesses, including Ajmal himself." 67 F.3d at 15. The questions, the Second Circuit found, were "non-fact-clarifying questions which turned the jurors from their neutral role into inquisitors." *Id.* The Second Circuit found that the "district court's decision to invite juror questioning was not necessitated by the factual intricacies of the banal drug conspiracy" and reversed the defendant's conviction. *Id*.

Tavares cites *United States v. Collins*, 226 F.3d 457, 461 (6th Cir. 2000), for the proposition that "there is a certain awkwardness for lawyers wishing to object to juror-inspired questions." It is difficult for one to imagine what, if any, awkwardness could have resulted from the process utilized by the district court in the present case because the objections, when there were any, were noted on the handwritten juror question itself and then passed back to the judge from the attorneys. If the judge wanted further elaboration as to any party's objection, the court would order to parties to the sidebar for a conference. This process prevented the jurors from determining which party objected to any particular question.

Tavares also relies on *Collins* for the proposition that "[w]hen a court declines to answer a question, the questioning juror may feel that his pursuit of the truth has been thwarted by rules she does not understand." 226 F.3d at 462. Although this is a possible occurrence in some trials, there is no identifiable instance or remote suggestion that it occurred in this case. Furthermore, the district court explained that it may not ask some questions presented because of legal reasons and the rules of evidence.

Tavares advances the argument that the jurors "might be distracted from comprehending new testimony by preparing questions on prior testimony." *United States v. Douglas*, 81 F.3d 324, 326 (2d Cir. 1996). Not only is there no support for this assumption, but Tavares cites no case and offers no examples in which this distraction ever occurred. In fact, in the present case, it is just as likely that the jurors drafted questions during the frequent and lengthy pauses in witness testimony caused by innumerable defense objections and requests for sidebar conferences.

Citing *Collins* Tavares says that a "concern has also been expressed over a risk that a sense of camaraderie among jurors may lead them to attach more significance to questions propounded by fellow jurors than those posed by counsel." However, the results of one study that examined juror notetaking and question asking in 160 trials indicate that many of the theoretical problems often

associated with juror questioning of witnesses does not arise in practice. Heuer and Penrod, Juror Notetaking and Question Asking During Trials (A National Field Experiment), 18 Law & Hum. Behav. 121 (1994) ("Potential disadvantages of questions are not supported: Jurors do not ask inappropriate questions, are not embarrassed or angered by objections, do not become advocates rather than neutrals, and do not overemphasize their own questions and answers. Counsel are not reluctant to object to juror questions. The jury does not draw inappropriate inferences from unanswered questions, and questions do not have detectable prejudicial effects.").

Many of the cases cited by Tavares rely on language found in the Chief Judge Lay concurring opinion in *United States v. Johnson*, 892 F.2d 707 (8th Cir. 1989). *Johnson* is often cited for the proposition that there is a risk that jurors may shed their neutrality and become biased. Importantly, however, the *Johnson* case is easily distinguishable from the instant case. In *Johnson*, a simple one-defendant cocaine distribution case, six questions were asked by the jurors of which five were directed to the defendant and one to a witness. The five questions directed to the defendant regarded his history of drug use and his role in the drug transaction. Furthermore, these questions were asked verbally in open court by the jurors and asked directly to the defendant and witness and there were essentially no prophylactic measures employed by the district court. Most importantly, the

majority in *Johnson* stated that, "this court has found that permitting jurors to question witnesses is not itself plainly erroneous. In light of this authority, we express no opinion on the appearance and propriety of juror questioning in general and conclude that the lower court did not plainly err in permitting such questions." *Id*. at 710 (internal citation omitted).

Finally, Tavares argues that she was possibly prejudiced by individual juror questions and points to several of the questions asked by jurors to advance this argument. Nevertheless, Tavares is unable to state why the individual questions posed by the jurors in this case support her theoretical arguments against juror questioning and "[u]ltimately, however, whether juror questioning constitutes an abuse of discretion is a factually intense inquiry requiring a case-by-case analysis." *United States v. Richardson*, 233 F.3d 1285, 1291 (11th Cir. 2000).

The fatal flaw in Tavares's argument is that she has not demonstrated any actual prejudice. While there exists a remote theoretical possibility for potential prejudice to arise in a trial where jurors are allowed to ask questions, Tavares has not identified what particular question or questions she thinks caused the practice to become prejudicial in this particular trial (or why the eleven judicial circuits, including the First Circuit, that permit questions from jurors are wrong.)  Tavares's arguments are highly speculative and she identifies nothing in the record to support her assertion that, through asking questions of the witnesses, the jurors "crossed

the essential boundary between constitutionally-required neutral factfinder (sic) and active investigative body and that process produced premature deliberation on the merits of the case." (Motion at 15).    Furthermore, Tavares reaches the unsupported conclusion that the juror questions sought to introduce new or unrelated subject matter that somehow assisted the government in advancing its theory of the case. (Motion at 16).  It is just as likely that the questions asked by the jurors sought to introduce evidence that assisted the defense since the jury acquitted the defendants on approximately 30 charges and predicate acts. In fact, the only witnesses to be questioned were the government's witnesses, since the defendants did not put on a case. Essentially, the jury questioned only the government's theory of the case.

Tavares's claim that she was denied a fair trial due to extensive questions posed to the prosecution's witnesses fails and does not present a substantial question of law as required under 18 U.S.C. 3143(b)(1)(B).

## 2.    The District Court's Instructions Did Not Undermine Tavares's Good Faith Claim.

Tavares contends that the district court erred in instructing the jury that certain conduct, including the passing of names to interview panels, was "questionable." (Brief at 21-23) Such instructions, Tavares claims, improperly invaded the fact-finding province of the jury. (Brief at 22-23).  Not so.  First, the purpose of the court's comments regarding this particular practice (passing names

of preferred candidates to interview panels) was to ensure that the jury understood the criminal allegations in this case. As the court noted at numerous points during the trial, there was a significant amount of evidence presented about conduct that was not, standing alone, criminal. It was, however, directly related and relevant to the scheme to defraud and thus properly admitted. In order to ensure that the jury did not hold such conduct against the defendants (or convict them on the basis of it), the court appropriately distinguished between conduct that was criminal and conduct that was not criminal. The fact that the court commented on the nature of this non-criminal conduct, in order to distinguish it, is not error.

The United States Supreme Court has explained:

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Quercia v. United States*, 289 U.S. 466, 469 (1933) (internal citations omitted).

This Circuit has adopted those principles. "It is unquestioned that, when instructing a jury, a judge may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles." *United States v. Hernandez*, 490 F.3d 81, 84 (1st

Cir. 2007) (no error where trial judge "explained to the jury how . . . a meeting [which was a hotly-contested piece of evidence], if the jury believed beyond a reasonable doubt that it had occurred, would relate to the conspiracy charge"); *United States v. Maguire*, 918 F.2d 254, 268 (1st Cir. 1990) (same, citing *Quercia*).

Moreover, the court expressly instructed the jury that it was their job to determine if any such conduct actually occurred. *See* 7/15/14 Excerpt Transcript of Jury Charge at 30 ("Now, if any of that happened – and I won't say it did or that it didn't, but there's evidence and you decide what you make of it."). Accordingly, Tavares's claim for relief on this ground should be denied.[5]

### 3.     The Court Did Not Inappropriately Omit A Good Faith Instruction

Tavares contends that the court improperly failed to instruct the jury on good faith. (Brief at 24-26). That argument is without merit. Courts are not required to instruct specifically on "good faith" where there is a proper instruction on intent to defraud. Indeed, the case law cited by Tavares says precisely that. *See, e.g.,*

---

[5] Tavares also claims that the court's comment regarding this practice was factually wrong, *i.e.*, it was appropriate for the Commissioner to provide input and instruction to interview panel members. First, the evidence at trial established that O'Brien and his staff were not providing *input and instruction* to the interview panels; they were telling them who to advance so they could advance politically sponsored candidates. Even if that were not the case, the court expressly instructed the jury, at multiple points over the course of the trial, that they were the finders of fact in this regard – not the court.

*Dockray*, 943 F.2d at 155 ("There is nothing so important about the words 'good faith' that their underlying meaning cannot otherwise be conveyed. Thus, where the court properly instructs the jury on the element of intent to defraud – essentially the opposite of good faith – a separate instruction on good faith is not required." (internal citations and quotations omitted).

The district court appropriately instructed the jury on the element of "intent to defraud." Notably, the court's "Chart of Elements of Offenses and Racketeering Acts Charged" ("Cheat Sheet"), which was a guide to the elements provided by the court to the jury for use in its deliberations, emphasized that the elements of aiding and abetting are: "Sharing the same criminal intent to commit mail fraud as the principal actor" and "doing something to help make the mail fraud occur." The court more fully explained this instruction as to O'Brien (in the context of mail fraud) and Tavares (in the context of aiding and abetting mail fraud) in its formal jury charge. *See, e.g.*, 7/15/14 Excerpt Transcript of Jury Charge at 35-40 (O'Brien and mail fraud); 45 (Tavares and aiding and abetting mail fraud). Tavares's contention that the court failed to instruct the jury specifically as to intent is, therefore, wrong.

In addition, Tavares contends that the court erred in failing to remind the jury of every theory of "good faith" presented at trial. Once again, it is Tavares who is in error. She claims that she presented evidence and argument regarding

the defendant's belief that they could hire whomever they wanted, notwithstanding the provisions of the Manual.  Putting aside the absurdity of this argument, the court's instruction on specific intent did not foreclose the jury from considering it in determining whether the defendants had a specific intent to defraud.  Indeed, at the end of the intent instruction, the court stated: "So to sum up, if . . . [O'Brien] knows the process is fraudulent, that improper entries are being made or composites are being fudged, if the system is intrinsically fraudulent as to the specific person we're talking about – and he certifies the personnel standards were followed, then you may find that that is a fraudulent representation."  7/15/14 Excerpt Transcript of Jury Charge at 39, line 23 to 40, line 4.  Given that instruction, the jury could have found, as Tavares suggests, that there was no fraudulent misrepresentation because neither O'Brien nor Tavares had any knowledge that they were doing anything wrong (or, to put it another way, neither had any idea that the process they were engaging in was fraudulent).  The jury, of course, did not so find because the evidence at trial overwhelming demonstrated that each had a specific intent to engage in a fraudulent hiring scheme.  For each of these reasons, Tavares's claim of error should be denied.

### 4.    The Court Did Not Erroneously Instruct The Jury On "Merit Hiring"

In a twist on the foregoing argument, the Tavares next contends that the court's instructions regarding "merit hiring" were erroneous because its instruction

usurped the jury's role as fact finder. (Brief at 26-27).  In particular, Tavares claims that the court erred in telling the jury that the Manual "expects, contemplates merit selection, that the best person, the most qualified person will get the job," *see* 7/15/14 Excerpt Transcript of Jury Charge at 27, because that is a fact to be found by the jury. (Brief at 27).

As a threshold matter, Tavares's suggestion that there was evidence that the Manual did not require merit-based hiring is a fallacy.  The defendants may have argued this point through cross examination or in closing, but, as the court instructed the jury on multiple occasions, the lawyers' arguments are not evidence. There was simply no evidence presented at trial that the Manual did not require merit-hiring. The Manual explicitly required merit hiring.  Regardless, the court's instructions regarding its view of the Manual were not in error.  The court made clear – crystal clear – throughout the course of the trial and in its instructions that "descriptions or [] references to the evidence are simply in an effort to teach you the legal implications of findings . . . [t]he determination about evidence rests entirely with . . . [the jury]."  7/15/14 Excerpt Transcript of Jury Charge at 8; *see, e.g., Quercia*, 289 U.S. at 469 (a judge may express his opinion regarding the evidence so long as he makes it clear that the determination of the evidence rests with the jury).  Accordingly, Tavares's claim of error must fail.

**5.    The Court Did Not Erroneously Instruct The Jury As To Aiding And Abetting**

Tavares next contends that the court's instructions on aiding and abetting were erroneous because the instructions: (1) failed to explain that the required "act" must be in furtherance of the alleged crime; (2) trivialized the "act" requirement; and (3) were too specific and thus invaded the province of the jury. (Brief at 27-29). All three arguments are faulty. First, the court properly instructed the jury regarding the "act" element of aiding and abetting. In order to prove the crime of aiding and abetting mail fraud, the government must establish that Tavares (1) took an affirmative act in furtherance of the fraud; (2) with the intent of facilitating the fraud. *See Rosemond v. United States*, 134 S.Ct. 1240, 1245 (2014). Here, the court instructed the jury that (1) "Ms. Tavares has got to share the same criminal intent as Mr. O'Brien . . . ."; and (2) "If she does, then she's got to do something *to make it come about*. She's got to take some act herself *to help it out*." 7/15/14 Excerpt Transcript of Jury Charge at 45 (emphasis added). This portion of the court's charge clearly lays out the two elements of aiding and abetting, including each aspect of the "act" requirement.[6]

Moreover, the court's instructions did not trivialize or mischaracterize the "act" requirement. As the court explained, the government had to prove that

---

[6] The fact that the court went on to provide examples of possible "acts" which may satisfy the act requirement does not negate or confuse the court's instructions regarding the "act" element. *See* 7/15/14 Excerpt Transcript of Jury Charge at 46.

Tavares took some act to "help" the scheme to defraud. *See* 7/15/14 Excerpt Transcript of Jury Charge at 45.[7] Tavares's argument that the act must somehow be substantial is unsupported by any authority. To the contrary, the common law of aiding and abetting, acknowledged and applied by the Supreme Court in *Rosemond*, included the principle that a person's involvement in the crime "could be not merely partial but minimal too;" the quantity of assistance is immaterial, "so long as the accomplice did something to aid the crime." *Rosemond*, 134 S.Ct. at 1246 (internal quotations, citations and emphasis omitted). The examples provided by the court in its jury charge (sending files for interviews, sending out letters, collating files) were not trivial; they are all acts which could satisfy the "act" requirement if they were done "in furtherance of" (or "to help") the scheme to defraud.

Finally, the court's instruction did not invade the fact-finding province of the jury. A court may properly "explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles," *Hernandez*, 490 F.3d at 84, "provided he makes clear to the jury that all matters of fact are submitted to their determination." *Quercia*,

---

[7] Tavares suggests that the act must be in furtherance of the material misrepresentation. The crime charged, however, is a scheme to defraud by means of a material misrepresentation. Thus, the "act" must be in furtherance of that scheme to defraud.

289 U.S. at 469.  That is precisely what the court did here.  In order to assist the jury, the district court provided possible examples of evidence that could satisfy the "act" element of aiding and abetting.  Indeed, recognizing the boundaries of its authority, the court expressly used the word "maybe" before each of the descriptive "acts," *e.g.*, "maybe she sends the files for the interviews to the people, maybe she sends out letters, maybe she collates files . . . ."  7/15/14 Excerpt Transcript of Jury Charge at 45-46.  Moreover, the court explained that even if the jury found that such acts occurred, the jury had to find that Tavares engaged in those acts in order to "help" the alleged fraudulent hiring scheme and that she possessed the same criminal intent as O'Brien.  *See id.*  The court's instructions, therefore, were appropriate and did not invade the fact-finding province of the jury.

### 6.    The Court's *Pinkerton* Instruction Was Appropriate

Tavares also complains that the district court should not have instructed the jury on co-conspirator liability pursuant to *United States v. Pinkerton*, 328 U.S. 640 (1946).  Particularly, she complains that: (1) the *Pinkerton* rule should not be applied in a marginal case and that the case at bar was a marginal case; and (2) *Pinkerton* does not apply in RICO cases. (Brief at 29-32).

As discussed above, there was substantial evidence of Tavares's participation in the charged conspiracy.  Unlike many RICO cases where many different types of criminal acts are committed by various participants, the

Indictment in the case at bar charges multiple criminal acts committed pursuant to a single scheme to defraud. Thus, the substantive offenses and predicate acts charged in the Indictment were clearly reasonably foreseeable to any member of the conspiracy. This was not a marginal case where the evidence of a conspiracy was weak and there was a danger that the jury would infer from the commission of the substantive offenses that a conspiracy existed. *See United States v. Sanchez*, 917 F.2d 607, 612 n.4 (1st Cir. 1990) (upholding a *Pinkerton* charge). To the contrary, there was significant direct evidence from several witnesses that established the existence of the conspiracy. Due to the extensive nature of the conspiracy and the large number of individuals delegated with responsibilities by the defendants, a *Pinkerton* charge was especially appropriate where the defendants could not have possibly participated in all the acts necessary to accomplish the goals of the conspiracy.

Finally, despite Tavares's contentions to the contrary, the Supreme Court has endorsed the use of *Pinkerton* in RICO cases. *See Salinas*, 522 U.S. at 63-64. In *Salinas*, the defendant was convicted of RICO conspiracy. The defendant appealed and contended that the conviction should be reversed because he had neither committed nor had he agreed to commit two predicate acts. The Supreme Court rejected this argument and explained,

> A conspiracy may exist even if a conspirator does not agree to commit
> or facilitate each and every part of the substantive offense. (citation

34

omitted)  The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other.  *See Pinkerton v. United States*, 328 U.S. 640, 646, 66 S.Ct. 1180, 1183-1184, 90 L.Ed. 1489 (1946). ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward.")  If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as a guilty as the perpetrators.  As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person."

*Id.* at 63-64 (citation omitted) (emphasis added).  On these grounds, Tavares's *Pinkerton* claims must be denied.

## B.    THE ISSUES IDENTIFIED IN O'BRIEN'S BRIEF ALSO FAIL TO PRESENT A SUBSTANTIAL QUESTION OF LAW LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL.

Prior to trial, O'Brien filed a motion to dismiss the Indictment which the district court (Saylor, J.) denied.  *See United States v. O'Brien*, 994 F.Supp.2d 167 (D.Mass. 2014).  In his motion for release, O'Brien contends that the district court erred in denying that motion, and that the issues raised constitute a substantial question of law which, if decided in his favor on appeal, are likely to result in a reversal or new trial. *See* 18 U.S.C. §3143(b)(1)(B).  He is wrong.

### 1.    The Indictment Sufficiently Alleged Mailings "In Furtherance Of" The Charged Scheme

O'Brien argues that the Indictment failed to sufficiently allege the charged mail fraud crimes. (Motion at 9).  As discussed in detail in the government's opposition to the defendants' motions to dismiss the Indictment and the district

court's order denying the motions, the defendants' motion to dismiss the mail fraud charges was unsupported by the facts or the law. As such, the district court did not err in denying it.

Counts Three through Twelve of the Indictment alleged that the defendants committed mail fraud, in violation of 18 U.S.C. §1341. In addition, Count Two charged 22 instances of mail fraud as racketeering predicate acts (together, "mail fraud charges"). D. 1 at 18-19, ¶27]. O'Brien contends that the Indictment failed to allege facts sufficient to establish the required elements of mail fraud. In particular, he claims that the Indictment (1) failed to allege mailings "in furtherance of" the scheme to defraud; and (2) failed to allege a deprivation of property. As the district court found, the Indictment sufficiently alleged all of the requisite elements of mail fraud.[8]

First, O'Brien alleges that the district court erred in failing to dismiss the mail fraud charges because the "mailings" described in the Indictment are not mailings "in furtherance of" the charged scheme to defraud. In particular, he claims that the alleged mailings - namely rejection letters sent to candidates who

---

[8] In order to establish the crime of mail fraud, the government must allege and prove: "(1) the devising or attempting to devise a scheme or artifice to defraud; (2) the knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme." *United States v. Pimental,* 380 F.3d 575, 584 (1st Cir. 2004).

did not obtain jobs - were an unnecessary administrative function that occurred after the charged scheme to defraud had reached fruition. (Motion at 12-17). This argument ignores both the allegations in the Indictment and well-established law.

With respect to the "mailing element," the government must allege facts sufficient to establish that the defendants: (1) caused the use of the mails, which includes reasonably foreseeable mailings; and (2) used the mails for the purpose, or in furtherance, of executing the scheme to defraud. *See United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008); *see also United States v. Stergios*, 659 F.3d 127, 132 (1st Cir. 2011). The "in furtherance" requirement "is to be broadly read and applied." *Hebshie*, 549 F.3d at 36. Indeed, the mailings need not be an essential element of the scheme but need only be "incident to an essential part of the scheme." *Id.* (internal quotations omitted). Put another way, there need not be a "but for" link between the mailing and the fraudulent scheme; however, "the scheme's completion or the prevention of its detection must have depended in some way on the mailings." *Id.* (internal quotations omitted).

Courts routinely have held that mailings that lend a false air of legitimacy to the fraud scheme, and thus help prevent its detection, are "in furtherance of" that scheme. *See, e.g., United States v. Sorich*, 523 F.3d 702, 714 (7th Cir. 2008) (rejection letter sent to non-politically connected candidate was "in furtherance" of the fraudulent hiring scheme because the letter was sent at a time when "the overall

hiring scheme continued, and . . . [the letter] lent a false air of propriety and regularity to the city's hiring process); *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002) (rejection letter sent to company who did not receive bid furthered the rigged bidding scheme "by falsely portraying to anyone who examined . . . [the] records that the bids submitted were legitimate, thereby concealing the true nature of the scheme."); *see also Pimental*, 380 F.3d at 587-88 (mailings designed to "lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant less likely . . . are sufficient under the statute." (internal quotations, citations and emphasis omitted)).

In general, the Indictment alleged that rejection letters were mailed to unsuccessful candidates during and in furtherance of the fraudulent hiring scheme. *See* Indictment at 18-19, ¶27 (racketeering acts) and 31-32 (substantive mail fraud counts). In particular, the Indictment alleges that the rejection letters were mailed, "approximately," on dates ranging from November 2000 to October 2008. *See id.* Relying on the Supreme Court's decisions in *United States v. Kann*, 323 U.S. 88 (1944), *Parr v. United States*, 363 U.S. 370 (1960) and *United States v. Maze*, 414 U.S. 395 (1974), O'Brien contends that the these letters are not "in furtherance of" the alleged hiring fraud because each letter was "a ministerial or administrative

communication" mailed after the alleged scheme reached fruition. Motion at 13-19.  This claim is bootless.

In plain English, the Indictment alleged one fraudulent hiring scheme that took place "between 2000 and 2010."  Indictment at 12-13, ¶3 ("Between 2000 and 2010, the defendants. . . devised and intended to device a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, in that the defendants. . . did award employment and promotions to individuals who were solicited from and sponsored by members of the Massachusetts legislature and others when those sponsored individuals were not the most qualified candidates who had applied . . . ."); 31, ¶1 (Paragraphs . . . Three through Twenty-Six of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.").  As part of that scheme, the Indictment alleged that the defendants created a sham hiring system in order to conceal the true nature of their hiring decisions and create the aura of a legitimate, merit-based hiring process.  *See* Indictment at 8-9, ¶¶18-19.  The sham hiring system was essential to the longevity and continuity of the alleged hiring scheme.  The rejection letters - all of which were mailed within the time frame of the alleged hiring scheme - assisted the defendants in creating that sham hiring system.  *Id*.  Indeed, like the rejection letters in *Sorich* and *Fernandez*, they "lent a false air of propriety and regularity" to the hiring process.  *See Sorich*, 523 F.3d at

714; *see also Fernandez*, 282 F.3d at 508. The rejection letters, therefore, were "incident to an essential part of the scheme" and thus are sufficient to form the basis of a mail fraud charge. *See Hebshie*, 549 F.3d at 36.[9] Accordingly, this claim does not support release.

### 2. The Indictment Sufficiently Alleged A Scheme To Obtain Money Or Property

O'Brien claims that the Indictment failed to allege a deprivation of a property right, in that it (1) did not allege a scheme to defraud that involves "obtain[ing]" jobs or salaries; and (2) did not allege a deprivation of property. (Motion at 19-27). The first is wrong as a matter of fact; both are wrong as a matter of law.[10]

---

[9] O'Brien's reliance on *Kann*, *Parr* and *Maze* is misplaced. The Supreme Court's decision in those cases was driven by the particular facts therein. Unlike the mailings in each of those cases, the rejection letters here constitute more than mere "post-fraud accounting" on which the success of the fraud did not turn. *See Schmuck v. United States*, 489 U.S. 705, 714 (1989). Here, the rejection letters, like the interviews and scoring sheets, helped the defendants to create a sham hiring system that allowed them to conceal their fraud. As in *Schmuck*, where the success of the fraud depended, in part, upon Schmuck's relationship with automobile dealers, the success of the defendants' fraud depended, in part, upon their ability to make their hiring decisions appear legitimate. The rejection letters to unsuccessful candidates assisted in that process and are thus "in furtherance of" the alleged hiring fraud.

[10] O'Brien argues that the government has failed to allege a deprivation of property. To be clear, the mail fraud statute, while limited in scope to the protection of property rights, covers both intangible and tangible property. *See Carpenter v. United States*, 484 U.S. 19, 25 (1987) (the intangible nature of confidential business information "does not make it any less 'property' protected

First, O'Brien argues that the alleged scheme to defraud did not involve "obtaining" jobs or salaries and thus it cannot form the basis of a mail fraud charge.   In essence, he contends that the Probation Department already had "obtained" funding for the relevant jobs at the time of the alleged hiring fraud. Thus, the alleged scheme was not a scheme to "obtain" jobs and salaries as required by the mail fraud statute. (Motion at 20-21).  That argument is premised upon a misunderstanding of the plain language of the Indictment.  In fact, the Indictment did not allege that the defendants engaged in a scheme to obtain jobs and salaries.  Rather, the Indictment alleged that the defendants engaged in a scheme to obtain jobs and salaries *for individuals who were politically sponsored and not the most qualified candidates*.  *See* Indictment at 12-13, ¶3 (defendants "devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, in that the defendants and their co-conspirators did award employment and promotions to individuals who were solicited from and sponsored by members of the Massachusetts legislature and others when those sponsored

---

by the mail and wire fraud statutes.  *McNally* [*v. United States*, 483 U.S. 350 (1987)] did not limit the scope of §1341 to tangible as distinguished from intangible property rights."); *United States v. Granberry*, 908 F.2d 278, 280-81 (8th Cir. 1990) (the right to control a thing, *e.g.*, money, is an integral part of the property right in the thing itself and constitutes intangible property for purposes of the mail fraud statute).

individuals were not the most qualified candidates who had applied for the employment or promotion.  In so doing, *the defendants obtained money and property, to wit, jobs and salaries for individuals who were not the most qualified candidates, but who had the sponsorship of a member of the state legislature or some other individual of significance to members of the enterprise*." (emphasis added)).  It is well-established that providing merit-based state jobs and promotions to individuals who are not the most meritorious candidates can constitute a scheme to obtain money or property under 18 U.S.C. §1341.  *See, e.g., United States v. Doherty*,  867 F.2d 47, 55-56 (1st Cir. 1989) (indictment sufficiently alleged mail fraud where it alleged that the coconspirators illegally assisted relatives, friends and associates in obtaining appointment to or promotion within police departments in the Commonwealth, jobs that were governed by a merit-based civil service system); *United States v. Sorich*, 523 F.3d 702, 712-13 (7th Cir. 2008) (indictment sufficiently alleged mail fraud where it alleged that defendants set up a "false hiring bureaucracy" by providing city jobs to politically sponsored candidates who were not necessarily the most qualified, thereby cheating the City of Chicago out of hundreds of millions of dollars because "the city paid for, and was cheated out of, qualified civil servants"); *see also United States v. Leahy*, 464 F.3d 773, 786-89 (7th Cir. 2007) (indictment sufficiently alleged mail fraud where it alleged that defendants, by misrepresenting their status

as minority-owned businesses, fraudulently obtained over $100 million in city contracts and subcontracts; while city would have paid the money to someone, Chicago lost out on its right to obtain the services from a minority-owned business); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (indictment sufficiently alleged mail fraud where it alleged that defendant fraudulently obtained a bus driver's permit and a job as a bus driver thereby obtaining wages from the local school district; the school district, said the court, was deprived of money "in the very elementary sense that its money [went] . . . to a person who would not have received it if all of the facts had been known").

Next, O'Brien argues that the Indictment failed to allege a deprivation of property. The argument is as follows: unlike *Doherty* and *Sorich*, which involved civil service jobs, the Commonwealth of Massachusetts has no right to the most qualified probation officers because the state legislature gave the Commissioner of Probation exclusive hiring authority and neither chapter 211B nor the Trial Court Manual apply to Probation. This argument is deeply flawed.

The Indictment properly alleged that: (1) the Probation Department is a department within the Administrative Office of the Trial Court ("AOTC") and the CJAM had oversight over Probation; (2) the Commissioner had exclusive appointment, but not hiring, authority under M.G.L., Chapter 276, §83; (3) the CJAM had to approve (and had the authority to reject) each appointment and

promotion; and (4) pursuant to M.G.L., Chapter 211B, §8 and the *Trial Court Policies and Procedures Manual*, AOTC, including the Probation Department, had a merit-based hiring system. *See* Indictment at 1-5. The Indictment also alleged that the defendants engaged in a scheme to defraud and to obtain money and property, *i.e.*, state jobs and salaries, for politically sponsored individuals who were not the most qualified candidates. *See id.* at 12-13.[11] Since state jobs and salaries constitute money and/or property for the purposes of 18 U.S.C. §1341, these allegations are more than sufficient to state a claim for mail fraud. *See, e.g., Doherty*, 867 F.2d at 56 (indictment charged "a valid conspiracy to defraud the

---

[11] O'Brien's argument focuses on the government's failure to allege a "deprivation" of property. The elements of mail fraud, however, require only that the government allege and prove a scheme or artifice to defraud, or to obtain money and property by means of false and fraudulent pretenses. *See* 18 U.S.C. §1341; Judge D. Brock Hornsby's 2008 Pattern Criminal Jury Instructions for the District Courts of the First Circuit, §4.18.1341. Indeed, while some mail fraud cases include a discussion of the "deprivation" of property, it is well-established that the government does not have to prove contemplated harm to the victim or any loss in order to establish a charge of mail fraud; rather, the government must allege and prove that the object of the fraud was to obtain money or property. *See, e.g., Leahy*, 464 F.3d at 786-89.

Assuming, *arguendo*, that the government was required to so plead, O'Brien suggests three possible "victims" of the alleged fraud: the CJAM, unsuccessful applicants, and the Commonwealth. Any of these suggestions will do. Since the defendants were required, by the statutorily promulgated *Trial Court Policies and Procedures Manual*, to hire the most qualified candidates, the CJAM was deprived of his right to control who got jobs and promotions within the Probation Department, *see Granberry*, 908 F.2d at 280; the most qualified, unsuccessful candidates were deprived of their right to a job; and, the citizens of this Commonwealth were deprived of their right to the most qualified probation officers.

Commonwealth of money or property, namely a scheme for obtaining the money used to pay the salaries of those improperly promoted by means of false or fraudulent pretenses") (internal quotations and citations omitted); *Sorich*, 523 F.3d at 713 (7th Cir. 2008) ("salaries fraudulently obtained, . . . and job opportunities fraudulently denied, . . . represent property for purposes of mail fraud"); *Granberry*, 908 F.2d at 280 (8th Cir. 1990) (wages paid for fraudulently obtained employment, the ability to control the distribution of jobs (and who is hired to do them), and the ability to control how money is spent constitute tangible and intangible "property" under 18 U.S.C. §1341).  The district court did not err in rejecting this claim.

### 3.    The Indictment Sufficiently Alleged Gratuity Violations as Predicate Acts

O'Brien claims that the Indictment did not properly allege a violation of the Massachusetts gratuity statute.  This claim also does not allege a substantial issue.

The 58-page Indictment alleged a connection to official acts no less than a dozen times.  For instance, the Indictment stated: "To maintain their positions within the enterprise, to increase the budget and resources of the enterprise, to gain tighter control over the conduct of the enterprise, and to aggrandize power to themselves, the defendants and their co-conspirators sought to curry favor with members of the Massachusetts legislature and others who were in a position to impact the enterprise through legislation, budget authorizations, and in other ways,

by instituting a rigged hiring system that catered to requests from state legislators and others to employ and promote candidates for employment with the enterprise." Indictment at 7, ¶14. Also, "[t]hrough hiring and promoting individuals who were sponsored by members of the Massachusetts legislature, while also maintaining the façade of a merit-based hiring system, the defendants and their co-conspirators sought to influence legislators to increase the conspirators' ability to obtain favorable votes on their budget requests and other interests." *Id.* at 7, ¶16. Furthermore, the Indictment stated "[t]he defendant O'Brien engaged in the conduct described above…in order to influence and attempt to influence members of the legislature to act favorably on legislation and budget requests regarding the Probation Department as well as to assist the Chairman[12] in an upcoming contest for the post of Speaker of the House of Representatives." Indictment at 10-11, ¶27. These allegations (as detailed in the Indictment) easily satisfied the legal requirements of the Massachusetts gratuity statute utilized to support the RICO predicates.

The centerpiece of the Massachusetts gratuity statute is the giving of an item of "substantial value" to an official, "for or because of any official act performed" by the official. The government must "prove a link between a thing of value conferred upon a public official and a specific "official act" [or act within the

---

[12] The Chairman of the House Ways and Means Committee, Robert DeLeo.

official responsibility of the defendant] for or because of which it was given."
*Scaccia v. State Ethics Commn.,* 431 Mass. 351, 727 N.E.2d 824 (2000), quoting
from *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999).
However, a Massachusetts gratuity offense does not require a finding of corrupt
intent, such as the improper intent to influence official decision making. *See
Commonwealth v. Dutney*, 4 Mass. App. Ct. 363, 348 N.E.2d 812 (1976) (finding
gratuity offense to be a lesser included offense of Massachusetts bribery statute).
Rather, only some lesser intent need be shown. *United States v. Sawyer*, 85 F.3d
713, 730 (1996).

The Massachusetts gratuity statute was enacted into law before the Federal
gratuity statute, but "it is very similar to the Federal statute." *Scaccia*, 431 Mass.
at 354, 727 N.E.2d at 827-28; *see also Sawyer*, 85 F.3d at 736. In fact, the
Supreme Judicial Court ("SJC") stated, "In light of the similarity between the
Massachusetts and Federal statutes, as well as the legislative history of the
Massachusetts statute, we look to Federal law for guidance in construing §3 (a) and
(b)." *Scaccia,* 431 Mass. at 355, 727 N.E.2d at 828. The SJC also found that the
bribery statute typically involves a quid pro quo, in which the giver corruptly[13]
intends to influence an official act through a "gift," and that "gift" motivates an

---

[13] As stated previously, under G.L. c. 268A, §2 (a) and (b), bribery requires
proof of "corrupt intent," an element missing from the gratuity statute.

official to perform an official act.  In effect, what is contemplated is an exchange, involving a two-way nexus.  A gratuity in violation of the statute, in contrast, can either be provided to an official as a reward for past action, to influence an official regarding a present action, or to induce an official to undertake a future action. Only a one-way nexus need be established for a gratuity violation.  *Scaccia*, 431 Mass. at 356, 727 N.E.2d at 828-29; *Sun-Diamond,* 526 U.S. at 404-05; *see also United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999).  In *Scaccia*, the court stated,

> Certainly, a lobbyist's cultivation of friendship with legislators is legitimate and lawful. But when that cultivation involves hospitality or other gift giving above the permissible amount, it becomes suspect. Coupled with an intent that the gift influence a specific act, or, in the case of the recipient, when those gifts have an influence on an official act or constitute a reward for official acts already undertaken, such gifts constitute a violation of the gratuity statute.

*Scaccia*, 431 Mass. at 356, 727 N.E.2d at 829; *Sun-Diamond,* 526 U.S. at 404-05; *see also Sawyer*, 85 F.3d at 741.

The gratuity violations alleged in the Indictment easily satisfied the one-way nexus test as described in *Scaccia and Sun-Diamond*, 526 U.S. at 405.  Indeed, the Indictment specifically alleged that the defendants provided jobs and promotions to legislators' constituents to assist Chairman DeLeo in his campaign to become Speaker of the Massachusetts House of Representatives. The Indictment alleged that the defendants specifically intended the jobs and promotions provided to

legislators to influence particular official acts and were not limited to building a reservoir of goodwill as in *Sun-Diamond*. *See Sun-Diamond*, 526 U.S. at 404-05 (rejecting notion that government could establish a gratuity offense by showing that the defendant gave a government official a gratuity because of his official position in order to build a reservoir of goodwill). In the present case, the government satisfied, through the allegations in the Indictment, Justice Scalia's admonition that "[t]he insistence upon an "official act," carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." *Id.* at 406.

For these reasons, the Indictment was sufficient and does not provide a basis for release pending appeal.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court affirm the district court's denial of the defendants' motion for release pending appeal.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     */s/ Robert A. Fisher*
ROBERT A. FISHER
Assistant U.S. Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Robert A. Fisher, hereby certify that on January 5, 2015, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

**Attorneys for Tavares:**
Martin G. Weinberg, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116

R. Bradford Bailey, Esq.
Adamo Lanza, Esq.
Four Longfellow Place, 35th Floor
Boston, MA 02114

**Attorney for O'Brien:**
Stylianus Sinnis, Esq.
William W. Fick, Esq.
Christine DeMaso, Esq.
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210

/s/ *Robert A. Fisher*
<u>ROBERT A. FISHER</u>

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### Appeal Nos. 14-2312 and 14-2313

**Appeal No. 14-2312**

### UNITED STATES OF AMERICA,
### Appellee

**v.**

### JOHN J. O'BRIEN,
### Defendant-Appellant

_____

**Appeal No. 14-2313**

### UNITED STATES OF AMERICA,
### Appellee

**v.**

### ELIZABETH V. TAVARES,
### Defendant-Appellant

## <u>ADDENDUM</u>

1.   *United States v. O'Brien*, 994 F.Supp.2d 167 (D.Mass. 2014)